**FILED**

**NOV 2 3 2016**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1   McGUINN, HILLSMAN & PALEFSKY
    Scott M. Stillman, Esq. (State Bar No. 267506)
2   535 Pacific Avenue
    San Francisco, California 94133
3   Telephone:  (415) 421-9292
    Facsimile:  (415) 403-0202
4   Emails:     sstillman@mhpsf.com

5   Attorneys for Plaintiff-Relator

6

**SEALED**

7                **UNITED STATES DISTRICT COURT**

8                **EASTERN DISTRICT OF CALIFORNIA**

9

**2:16 - CV - 2789 MCE AC**

10   UNITED STATES OF AMERICA              CASE NO.: _____
     *Ex rel.* Loran Simon,
11                                          **COMPLAINT**
                      Plaintiff,            (31 U.S.C. §§3729 *et seq.*)
12                                          (False Claims Act)
            vs.
13                                          **DEMAND FOR JURY TRIAL**
     UNIVERSITY OF SAN FRANCISCO, and
14   COMMUNITY INITIATIVES,                 **FILED UNDER SEAL**

15                    Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT (False Claims Act)

**COMPLAINT**
(False Claims Act, 31 U.S.C. §§ 3729–3733)

## I.   PRELIMINARY STATEMENT

Relator Loran Simon, acting on behalf of and in the name of Plaintiff United States of America, brings this civil action under the Qui Tam provisions of the Federal False Claims Act, based on the defendants' knowing presentation of false and fraudulent claims to the United States Department of Education ("ED") and the Corporation for National and Community Service ("CNCS" or "AmeriCorps") to secure federal grants and federal funds for the San Francisco Teacher Residency ("SFTR") program at the University of San Francisco ("USF") — a fraud that caused the United States Government to lose substantial sums of money.  Relator Loran Simon ("Relator") also asserts a claim on his own behalf for violation of section 3730(h) of the False Claims Act.

## II.   JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733.  This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a) and § 3732(b).  Relator is an "original source" and is otherwise authorized to maintain this action in the name of the United States as contemplated by the False Claims Act.

2.      This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because all the defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted, business in this District.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because the defendants transact business in this District and have committed certain acts alleged herein in violation of 31 U.S.C. § 3729 in this District.

## III.   PARTIES

4.      Relator Loran Simon, a citizen of the United States and a resident of San Francisco County, California, is suing in the name of and on behalf of Plaintiff United States of America.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1   From on or about June 16, 2014 to on or about September 30, 2016, Relator was a USF employee

2   with the title of Assistant Director of the SFTR program. In this position, Relator was responsible

3   for, among other things, recruiting and admitting students into the SFTR program and managing a

4   recruitment budget provided by ED grant funds. Part of Relator's work entailed recruiting efforts

5   in this District. USF terminated Relator's position on September 30, 2016. On or about October

6   6, 2016, Relator resumed the position of SFTR Assistant Director, but the position was moved to

7   be "housed" at Defendant Community Initiatives, a fiscal sponsor of SFTR, and Relator became

8   an employee of Community Initiatives. Relator remains in this position today. Relator has

9   obtained direct and independent knowledge of the fraudulent acts alleged in this Complaint, within

10   the meaning of 31 U.S.C. § 3730(e)(4)(B), during Relator's tenure as the SFTR Assistant Director.

11       5.     Defendant University of San Francisco is a corporation incorporated in, and

12   operating under the laws of, the State of California, and is a private university located in the

13   County of Sacramento, California and the City of San Francisco, California. USF's campus in

14   Sacramento offers various courses for undergraduate and graduate students.

15       6.     Defendant Community Initiatives ("CI") serves as a fiscal sponsor for nonprofit

16   organizations. As an organization's fiscal sponsor, CI handles "back-office" services (e.g.,

17   financial, human resources, and grant management services) in order to allow the organization to

18   focus on its projects. CI is a fiscal sponsor of the SFTR program as well as Early Edge California

19   and Northern Sierra Partnership, which both conduct business in this District. CI managed the

20   AmeriCorps grants at issue here for the SFTR program for the 2014-15 and 2015-16 years.

21       7.     None of the allegations set forth in this Complaint are based upon any public

22   disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a

23   congressional, administrative, or General Accounting Office report, hearing, audit, or

24   investigation, or from the news media.

25       8.     Relator has complied with the statutory requirements of 31 U.S.C. § 3730(b)(2) by

26   serving on the Government a copy of this Complaint and a written disclosure statement of

27   substantially all material evidence and information that Relator possesses.

28   ///

McQuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1

## IV. OVERVIEW OF FRAUDULENT ACTS AND OMISSIONS

2       9.      Defendants USF and CI (collectively "Defendants") requested and obtained

3   substantial funds each year from the ED and CNCS through grant applications in which

4   Defendants certified that they administered and would administer the grants pursuant to applicable

5   law.

6       10.     At issue here are two separate sets of grants. The first was a grant received by USF

7   pursuant to the ED's Transition to Teaching ("TTT") program. The TTT grant totaled

8   approximately $2,151,961.00 over five years. The second set was a series of yearly grants that

9   USF and CI received from CNCS's AmeriCorps program. These grants were worth

10  approximately $3,085,129.00.

11      11.     Defendants knowingly and/or recklessly failed to administer these grants in

12  accordance with the assurances Defendants made to the Government. Instead, through submission

13  of false or fraudulent claims, Defendants acted to defraud the Government of money to which

14  Defendants were and are not entitled.

15      12.     The purpose of the fraudulent actions described in this Complaint was to obtain

16  unlawful and excess payment from the ED and CNCS. Defendants have submitted fraudulent

17  claims for federal grant monies in express violation of federal statutes, rules and regulations as

18  described herein. Defendants, with the knowledge and consent of senior administrators and

19  management of Defendants, have engaged in the following intentional, unlawful and fraudulent

20  activities:

21          a.      With respect to the TTT grant, USF received significant reimbursements for

22                  costs that USF was not allowed to charge to the TTT grant. For instance,

23                  USF charged the TTT grant for unallowable entertainment costs such as

24                  dinners at expensive restaurants. USF also charged the TTT grant for costs

25                  related to lobbying and travel of non-USF employees, which were

26                  unallowable under federal regulations.

27          b.      USF substantially mismanaged the TTT grant to such an extent that federal

28                  monies were used to pay a USF faculty member who did no work on the

McQuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1    TTT grant whatsoever.  Further, USF routinely overdrew TTT grant funds –

2    at one point drawing down $372,026.08 in a single day, which was nearly

3    88% of the TTT grant allotment for the year.

4     c. Regarding the AmeriCorps grants, Defendants were required to track the

5    time and effort of their AmeriCorps members, but Defendants failed to

6    adequately do so.  Defendants' AmeriCorps members consistently neglected

7    to fill-out and turn in contemporaneous timesheets.  It reached a point where

8    Defendants filled out timesheets for members and then required the

9    members to sign them.

10    d. Defendants also made false assurances to the Government that resulted in

11   payment of AmeriCorps money to USF students who were not enrolled in

12   the SFTR program and who were not entitled to the receipt of such federal

13   funds.

14   13. Defendants acknowledged internally the impropriety of some of their actions in

15   obtaining funds to which they were not entitled.  Defendants nonetheless continued to conceal

16   their wrongful acts from the Government.

17   14. More details as well as additional specific examples of the improper behavior on

18   the part of Defendants are set forth below.

19   **V. THE TRANSITION TO TEACHING GRANT**

20   **A. To Fund The SFTR Program, USF Applied For And Received The Transition To
     Teaching Grant From The U.S. Department Of Education**

21

22   15. High-need schools often struggle to hire and retain talented and committed

23   teachers.  To help address this challenge, the ED created the Transition to Teaching program.  The

24   TTT program supports the recruitment and retention of highly qualified mid-career professionals

25   and recent college graduates who have not majored in education to teach in high-need schools

26   through the development of new or enhanced alternative routes to certification.

27   16. The TTT program provides five-year grants to state and local educational agencies,

28   or for-profit organizations, non-profit organizations, or institutions of higher education

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

---

COMPLAINT (False Claims Act)     5

1  collaborating with state or local educational agencies. TTT grantees develop and implement

2  comprehensive approaches to train, place, and support teacher candidates who they have recruited

3  into their programs, which must meet relevant state certification or licensing requirements. TTT

4  grantees then ensure that program participants are placed to teach in high-need schools and receive

5  support to serve in these placements for at least three years.

6       17.     In 2011, Defendant USF applied to receive a five-year grant under the ED's TTT

7  program. The grant would be used to fund the work of the SFTR program.

8       18.     The SFTR program is a teacher training program that recruits and trains teachers

9  who will improve the achievement of historically underserved students in San Francisco's highest-

10  needs schools. SFTR is composed of five organizations that work together to operate the

11  program: USF, Community Initiatives, the San Francisco Unified School District ("SFUSD"), the

12  Stanford University Teacher Education Program, and the United Educators of San Francisco.

13       19.     All teacher candidates participating in the SFTR program earn an AmeriCorps

14  stipend as well as receive 50% tuition remission (at USF) or significant tuition fellowships and a

15  model loan forgiveness program (at Stanford) to defray the high costs of attending programs at

16  private universities. In return for this financial support and training, teacher candidates commit to

17  teaching in San Francisco for a minimum of three years.

18       20.     USF was awarded a five-year grant under the TTT program that covered a period of

19  sixty months (October 2011 through September 2016).

20  **B.     USF's Certifications, Assurances And Compliance Obligations**

21       21.     Beginning with its initial application for federal funding under the TTT program,

22  USF was required to make specific certifications and assurances to the ED.

23       22.     Indeed, by signing, and submitting its application, USF assured and certified to the

24  ED that the statements contained in its application were true, complete, and accurate.

25       23.     More specifically, in order to receive federal grant money, the TTT grant

26  application required USF to fill out and submit Application for Federal Assistance Form SF-424.

27  As part of this form, an "Authorized Representative" of USF agreed that:

28  ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

By signing this application, I certify (1) to the statements contained in the list of certifications[ ] and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances[ ] and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 218, Section 1001).

24.     Further, the TTT grant application contained a form entitled "Assurances – Non-Construction Programs." This form required USF to certify that it has or will comply with a variety of requirements. In relevant part, these requirements included that the applicant (USF) certified it:

a.     "Has . . . the institutional, managerial and financial capability to ensure proper planning, management and completion of the project described in this application";

b.     "[W]ill establish a proper accounting system in accordance with generally accepted accounting standards or agency directives";

c.     "Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain";

d.     "Will comply with all Federal statutes relating to nondiscrimination"; and

e.     "Will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program."

25.     This section of the application was to be signed by "the duly authorized representative of the applicant." Here, the authorizing official who certified the truth of the above-listed statements was USF's Director of Office of Contracts and Grants.

26.     Because this was a five-year award, each continued year of funding, USF would receive a Grant Award Notification ("GAN") that reaffirmed and/or updated the applicable regulations, rules, or obligations it was required to follow in accepting the continued funding. Further, each year's GAN addressed a number of issues including the total amount of the award for that year and the amount budgeted for specific costs such as salaries, consultant services, equipment and travel.

27.     All recipients of a multi-year discretionary award (such as USF) must submit an annual Grant Performance Report. The report should contain current performance and financial expenditure information for the grant. (34 CFR § 75.118).

McQuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1     28.    As part of each Grant Performance Report that USF submitted to the ED over the

2    course of the five-year grant, an authorizing representative of USF had to certify that:

> To the best of my knowledge and belief, all data in this performance
> report are true and correct and the report fully discloses all known
> weaknesses concerning the accuracy, reliability, and completeness
> of the data.

    29.    As described below, USF made false certifications to the Government and failed to

comply with the required obligations in accepting and managing this grant, thereby causing false

claims for reimbursement to be submitted to and paid by the United States Government.

**C.**    **Overview Of Specific Fraudulent Acts And Omissions Of USF Related To The TTT Grant**

    30.    USF's application for the TTT grant and the yearly GANs required compliance

with federal statutes, the Education Department General Administrative Regulations ("EDGAR"),

provisions of the Code of Federal Regulations ("CFR"), and circulars of the Office of

Management and Budget ("OMB").

    31.    These sources established the rules and requirements in a number of key areas for

institutions applying for and receiving grants. These key areas included: grant accounting;

financial management and cost principles; grant administration procedures; grant audit

requirements; grant reporting obligations; and grant closeout procedures.

    32.    These regulations, policy statements and circulars are promulgated to prevent and

uncover fraud. While these sources address a wide variety of topics, the fundamental, overarching

theme of them is that the grantee is ultimately responsible for the federal funds.

    33.    As described above, USF has certified to the Government that, in return for

receiving TTT grant funds, it has complied, and will comply, with the applicable requirements of

federal laws, regulations and policies. Yet, as set forth below, USF knowingly and/or recklessly

violated the rules it was required to follow as a recipient of federal money. These violations

occurred through USF's failures in the following four general areas: (1) failure to adhere to basic

cost principles; (2) failure to properly manage the receipt of federal funds; (3) failure to follow

time and effort reporting procedures; and (4) failure to submit accurate progress reports.

///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

**D. USF Submitted False Claims By Seeking And Receiving Payments For Charges That Violated Basic Cost Principles**

34. When seeking funds under a federal grant, the grantee must adhere to a series of cost principles. These cost principles are designed to ensure that any expenses paid from federal grants are: (1) reasonable; (2) allocable to the grant based on the accounting principles in OMB Circular A-21; (3) given consistent treatment through the use of generally accepted accounting standards; and (4) conform to any limitations or exclusions set forth in OMB Circular A-21 and/or the grant's notice of award with respect to both the type or amount of cost items. (OMB Circular A-21(C)(2)). A cost that meets all of these requirements is deemed to be "allowable" and can be properly charged to the grant.

35. OMB Circular A-21 lists a number of specific categories of expenses that are per se unallowable. For example, "entertainment costs," or "goods and services for personal use" are unallowable costs under all circumstances.

36. Costs that are unallowable need to be clearly identified and cannot be included in any billing, claim, drawdown, application or grant proposal. (OMB A-21(C)(12)). If an unallowable cost is paid with federal grant funds, the grantee must refund the money, with interest, to the grant's issuing agency. (OMB A-21(C)(8)).

37. Here, under the TTT grant, USF drew-down and received reimbursements from the ED for a significant number of unallowable costs and charges. These unallowable costs included the following:

38. USF received reimbursement for unallowable entertainment costs. (OMB A-21(J)(17)). For instance, in or about May and June of 2012, USF charged the grant over $5,071 in unallowable entertainment costs associated with international travel to Canada. These costs included charges for dining at expensive restaurants and luxury hotel accommodations.

39. USF received reimbursement for unallowable costs related to lobbying. (OMB A-21(J)(28)). For instance, on or about February 2, 2016, Relator and the SFTR Director, Jonathan Osler ("Osler"), traveled to a press conference at the California State Capitol to network with California legislators in support of three Senate bills that could provide state funding for the SFTR

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1  program. Thereafter, USF charged the TTT grant for the time and travel expenses associated with
2  this activity.

3      40.     USF received unallowable reimbursement from the TTT grant for meetings and
4  conferences. (OMB A-21(J)(32)). For example, in or about March 2014, May 2014, and June
5  2015, USF charged to the TTT grant over $6,000 for faculty to attend the American Educational
6  Research Association's annual meeting, which is a yearly networking event that USF faculty
7  attend every year. USF charged conference registrations fees and travel-related expenses for this
8  meeting. USF also charged the TTT grant for unallowable conference registration fees for the
9  New Teacher Center Symposium in or about June 2015.

10     41.     USF received reimbursement for unallowable costs related to travel. (OMB A-
11 21(J)(53)). In addition to the travel costs described above, during the lifetime of the TTT grant,
12 USF charged the grant over $14,000 in travel expenses for non-USF employees, which is
13 prohibited under federal regulations. (OMB A-21(J)(53)(a)). For example, on May 17, 2016, the
14 TTT grant principle investigator ("PI"), Dr. Geoffrey Dillon ("Dillon"), approved a reimbursement
15 request for travel charges for Osler who was a non-USF employee (Osler was an employee of
16 SFUSD). In fact, Osler filled-out a USF reimbursement form titled "University of San Francisco
17 Non-Employee Expense Report." This charge was approved by Dillon and charged to the TTT
18 grant.

19     42.     USF received reimbursement for unallowable alumni activities. (OMB A-
20 21(J)(4)). For example, on or about December 12, 2015, USF charged the TTT grant for Amazon
21 gift cards to give to USF alumni as compensation for their services at recruitment events at USF.
22 Relator was instructed to purchase these gift cards for a number of alumni for their participation at
23 recruitment events on or about October 6, 2015, November 4, 2015, and December 1, 2015. In
24 internal correspondence from Laurie Treleven ("Treleven"), the Director, USF Office of Contracts
25 and Grants, USF acknowledged that using TTT grant money to pay for gift cards was improper
26 and an unallowable cost. Treleven wrote in a February 2016 email that she had "updated the
27 unallowable cost list for grants to include gift cards which USF now disallows." On information
28 and belief, these past unallowable costs for gift cards were never returned to the ED by USF.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT (False Claims Act)                                                    10

1    43.    USF received reimbursement for unallowable fundraising.  (OMB A-21(J)(20)).

2  For instance, in or about May and June 2015, USF charged over $16,000 in charges for

3  fundraising consulting and assistance to the Center for Effective Philanthropy.  The Center for

4  Effective Philanthropy provides research, strategy consulting, resources, and educational programs

5  to help organizations better engage donors and funders.  USF not only charged these fees to the

6  TTT grant but also tried to conceal them by charging them to Relator's recruitment budget within

7  the grant.  Additionally, USF charged the grant over $1,300 in preparation costs (printing fees) for

8  the SFTR to present and pitch its program at a Funder's Forum on or about March 7, 2016 at the

9  James Irvine Foundation.

10    44.    USF received reimbursement for unallowable student aid costs (OMB A-

11  21(J)(45)).  For instance, from about May to August 2016, USF charged to the grant over $2,300

12  for five students to receive money for their CBEST, CSETs, LiveScan, and TB testing.  These

13  were unallowable because they were not approved by the ED and were not offered to students in

14  non-sponsored programs as is required under federal regulations.

15    45.    By way of another example of an unallowable student aid cost, Relator was

16  instructed to use his personal credit card to reimburse a student who paid for a standardized test

17  registration and then seek reimbursement from the TTT grant for Relator's payment.  This was

18  done so that it would not appear that grant funds were being used to directly compensate a student,

19  but rather appear as a grant employee seeking reimbursement.  Relator was told by Osler that this

20  scheme was approved by USF's Office of Contracts and Grants and Dillon approved this

21  reimbursement on or about June 24, 2016.  However, this payment was unallowable because it

22  was student compensation that did not meet the federal requirements for such compensation.  *(See*

23  OMB A-21(J)(45)).

24    46.    USF received reimbursement for unallowable student activity costs.  (OMB A-

25  21(J)(48)).  For example, beginning in 2014, Relator was instructed to coordinate and facilitate

26  numerous recruitment events, which usually occurred monthly, and sometimes bimonthly,

27  between September 2014 through January 2015, and between September 2015 through January

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

28

1  2016. For each of those events, Relator was told to invite former and current students and then to

2  purchase food and gift cards for them, which were unallowable costs.

3       47.    When USF submitted its TTT grant application, it certified that it would comply

4  with all terms and conditions set forth in the application, the relevant CFR and OMB provisions

5  and the GAN, which all required USF to only submit claims for payment that were allowable.

6  USF was aware, and/or should have been aware, that the costs described above were unallowable.

7  Yet, in blatant and/or reckless disregard for the laws and regulations it was required to follow,

8  USF used TTT grant funds to reimburse for these unallowable costs.

9       48.    USF failed to ever inform or refund the ED for its improper reimbursement of TTT

10  grant funds for unallowable costs.

11       49.    Thus, USF submitted false claims when it sought and received payment from the

12  TTT grant for unallowable costs. USF's conduct in concealing its obligation to repay these

13  unallowable costs for which it received federal money also gives rise to reverse false claims.

14  Finally, by failing to follow the OMB Circulars, USF's application and the certifications of

15  compliance amount to false claims.

16  **E.    USF Failed To Properly Manage Federal Funds In Accordance With Applicable**
**Laws, Regulations And Policies**

17  

18       50.    In a TTT grantee's application, it is required to submit a detailed budget for

19  approval by the ED. A grantee's budget is the financial expression of the federally funded project

20  or program. (2 CFR § 215.25(a); OMB Circular A-110(C)(25)). Using the submitted budget, the

21  federal awarding agency typically issues the GAN that sets forth the total award and breaks down

22  the available funds for each distinct budget category.

23       51.    To ensure federal funds are properly managed, grantees are required to have

24  financial management systems that: (1) provide for accurate, current, and complete disclosure of

25  results regarding the use of funds under grant projects; (2) provide adequate source documentation

26  for federal and non-federal funds used by grant projects; (3) contain procedures to determine the

27  allowability, allocability, and reasonableness of obligations and expenditures made by the grantee;

28  and (4) enable the grantee to maintain effective internal control and fund accountability

1  procedures, e.g., requiring separation of functions so that the person who makes obligations for the
2  grantee is not the same person who signs the checks to disburse the funds for those obligations.
3  (45 CFR § 74.21).

4      52.     Because a budget deviation changes the scope of the already approved project, a
5  grantee must receive prior approval if it deviates from its budget.  (34 CFR § 74.25(b); 2 CFR
6  §215.25(a); OMB Circular A-110(C)(25)).

7      53.     As described below, USF significantly mismanaged the TTT grant funds to such a
8  degree that USF failed in its obligation to adequately monitor and ensure that federal money was
9  being used for the purpose for which the grant was given.

10          *i.*     ***How The TTT Grant Management System Worked At USF***

11      54.     The drawdown and reimbursement mechanics of the TTT grant at USF worked
12  generally as follows: USF would spend its own funds for grant project needs and then seek
13  reimbursements of those funds from the ED by making electronic drawdowns through the ED's
14  "G5" system.

15      55.     In some cases, USF employees would spend their personal money on TTT grant
16  work and then submit their reimbursement requests to the PI who would approve the request and
17  charge the grant.  The request was then sent to the USF Office of Contracts and Grants for
18  processing.  Thereafter, USF would reimburse the employee and then seek reimbursements from
19  the ED by making monetary drawdowns through the G5-Payments module.

20      56.     The G5-Payments module allows for grantees to electronically drawdown funds for
21  their approved project.  When a payee (in this case USF) requests a drawdown of funds from the
22  G5 system, the ED records this as an expenditure against the specific grant award.

23      57.     USF was essentially on the honor system when it came to drawing down available
24  TTT funds from the ED.  USF was not required to submit any invoices or receipts for drawdowns
25  or reimbursements (although proper source documentation was required to be kept by USF).

26  ///

27  ///

28  ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

*ii.*    ***USF Substantially Mismanaged Its Drawdown Of TTT Funds In Violation Of Regulations And Policies***

58.    Federal regulations require grantees to plan carefully for cash flows for the grant project and to review projected cash requirements before each drawdown. (34 CFR §§ 74.21 and 74.22). Grantees are required to minimize the amount of time between the drawdown and the use of funds from their bank accounts. (34 CFR §§ 74.21 and 74.22). Funds must be drawn only to meet a grantee's immediate cash needs for each individual grant. If a grantee has excess cash balances, they must be promptly withdrawn from the grantee's account and returned to the ED (with any interest). Cash balances are considered to be in "excess" if they are maintained at a recipient/subrecipient longer than is needed for immediate use (usually three days).

59.    On information and belief, each time a grantee uses the G5 system to draw down a payment, the grantee must check a box certifying that the grantee is adhering to cash management requirements and that the funds will be spent within three days. The G5 screen displays the following message:

> I certify, by processing this payment request and/or re-allocation, that the funds are being expended within three business days of receipt for the purpose and condition of the agreement.

60.    Despite the above monitoring and administrative requirements, USF routinely mismanaged the TTT grant by engaging in misappropriate and improper drawdowns from the G5 Payments module. By way of example, on USF's first drawdown from the TTT grant on or about January 18, 2012, USF withdrew more funds than what it actually had expended and did not refund the ED. Indeed, USF overdrew by approximately $11,244.78. Additionally, this excess cash from the Government sat for nearly four and a half months until USF's next drawdown on or about May 31, 2012. The excess cash balance (and any interest) was never returned to the Government as federal regulations required.

61.    Further, as part of the GAN that the ED provided USF for the 2014-15 budget period, the ED included the following directive:

> The [ED] has recently encountered situations where grantees failed to request funds until long after the grantee actually expended its own funds for the costs of its grant. Grantees need to be aware that, by law, Federal funds are available for grantees to draw down for

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

only a limited period of time, after which the funds revert to the U.S. Treasury.  In some cases grantees have requested funds too late for the Department to be able to pay the grantees for legitimate costs incurred during their project periods.  The Department urges financial managers to regularly monitor requests for payment under their grants to assure that Federal funds are drawn from the ED G5 Payment System at the time those funds are needed for payments to vendors and employees.

62.    Yet, USF made a drawdown on or about May 31, 2012 and then went nearly a year until its next drawdown on or about April 30, 2013.  The April 30 drawdown was approximately eight months into that grant period's year and was for the excessively large amount of $372,026.08.  Such a delayed and excessive drawdown amount was not in accordance with implementation of payment methods that minimized the time elapsed between the need for reimbursement and the receipt of federal money. (34 CFR §§ 74.21 and 74.22).

63.    USF also engaged in a troubling and inappropriate pattern of accelerated drawdowns near the end of grant budget periods.  For instance, at the end of a budget period, Relator was instructed to accelerate his charges before the end of the period so that USF would not have to return funds or explain to the ED why it had not spent its budget as agreed.

64.    This process caused for unbudgeted (and many unallowable) items to be placed into Relator's "recruitment" budget, meaning charges not related to recruiting (and many that were also unallowable) were charged to Relator's budget category.  This scheme was done to conceal USF's failure to spend money in the already approved categories and resulted in false claims being submitted for unallowable and unbudgeted costs.

   iii.    **USF's Failure To Properly Monitor And Manage The TTT Budget Resulted In Improper Charges Hitting The Grant And A Practice Of Excessive Budget Reconciliations**

65.    On many occasions, USF charged a transaction to the TTT grant that should not have ever been charged to the grant.  For example, USF paid a professor's faculty salary using TTT grant funds; yet the professor did no work on the SFTR program in any capacity whatsoever.  USF did not refund the ED for these unallowable charges.

66.    Improper charges hit the TTT grant so frequently that a review of internal accounting records demonstrated over 400 instances of attempted reconciliation of unallowable

McQuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1  costs.  In fact, the Grants Coordinator wrote that "[w]e worked very hard to clean all discrepancies
2  since it doesn't look good with the [ED] when we draw more or less than we should, but it has
3  happened in the past.  In those cases, we adjusted in the next Draw where we put a note and the
4  justification of the mistake in the previous Draw."

5  67.    Moreover, when USF reimbursed someone for an unallowable cost and charged it
6  to the grant, USF's practice was to pull money over internally from another department to make-
7  up and cover that particular unallowable charge.  For instance, USF's Grants Coordinator wrote in
8  an email to Relator that "sometimes expenses are charged to the [TTT] grant that are not allowed
9  or by mistake . . . so we just give back the funds to the grant."  Relator followed up by asking,
10  "When you say that we give back the funds or refund the grant for charges that shouldn't have
11  been charged, how does that process work?  Where does the refund money come from?"  The
12  Grants Coordinator responded, in relevant part, "If we charge an account with an expense [that]
13  shouldn't [have been charged], we just fill[ ] out established paperwork and add the proper
14  justification and backup documentation to transfer the funds from one account to another."  This
15  practice violated federal regulations and policies with regards to handling funds that had been
16  improperly paid.

17  *iv.*    ***Backdating Charges***

18  68.    USF engaged in a process where it would backdate invoices and charges (and
19  backdate their reconciliation of unallowable charges) to conceal unallowable costs they made.

20  69.    In an email to Relator, USF's Grants Coordinator acknowledged that with respect
21  to TTT grant charges on USF's internal budget "sometime[s] transactions are backdated".

22  *v.*    ***Overcharging For Fringe Benefits***

23  70.    USF overcharged the TTT grant for employee fringe benefits.  (OMB A-
24  21(J)(10)(f)).

25  71.    For example, throughout the entire year of 2015, USF overcharged the TTT grant
26  for Relator's fringe benefits, thereby receiving excess funds from the Government instead of
27  spending them on fringe benefits as promised.  On information and belief, Relator alleges that

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292
28

1  USF was similarly overcharging for other employees' benefits and did not refund the excess
2  amount to the ED.

3      ***vi.***  ***Improper Contracting And Vendor Selection***

4     72.  USF received reimbursements from TTT grant funds for charges that violated
5  federal contracting and vendor selection regulations and policies.  (2 CFR §§ 200.318-320; OMB
6  A-21(C)(3)).  On information and belief, USF selected vendors and consultants without first
7  obtaining additional bids for the work.  In addition, USF awarded contracts based on personal
8  relationships with vendors.  For example, the original PI for the TTT grant, Dr. Peter Williamson,
9  chose to contract with his friends for website services and photographic work for the SFTR
10  program.  This was unallowable because USF failed to follow the required vendor procurement
11  processes.

12     73.  Further, when Relator began in 2014, he was instructed to renew (and draft a new
13  contract) with one of those same vendors, again without following the federal vendor selection
14  regulations.

15     74.  USF's vendor selection process also violated federal regulations that required all
16  charges to the TTT grant be reasonable and that grantees consider restraints and the requirements
17  of "arm's length bargaining".  (OMB Circular A-21(C)(3)).

18  **F.**  **USF Failed To Comply With Time And Effort Tracking And Reporting**
19     **Requirements**

20     ***i.***  ***Background On Federal Regulations And Policies Related To Time And Effort***
      ***Reporting***

21     75.  If USF wished to obtain federal funds through the TTT program, USF was required
22  to submit an application to the Government that, among other things, listed the employees who
23  would be paid through the grant, the percentage of their time to be spent on the project, and the
24  corresponding costs of their time that would be reimbursed by the Federal Government.  Through
25  a process referred to as "effort reporting," the grantee would then track and record the time a grant
26  employee spent working on a particular federal grant.

27     76.  Salaries for employees being paid by the grant often constitute one of the largest
28  areas of direct cost for a federal grant.  The general grant cost principles described above apply not

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT (False Claims Act)          17

1   only to expenses but to effort reporting as well. Thus, like any other direct cost, employees'

2   salaries must be: (1) reasonable; (2) allocable; (3) given consistent treatment based on accepted

3   accounting practices; and (4) in conformance with limitations or exclusions set forth in OMB

4   Circular A-21. (OMB Circular A-21(C)(2)).

5   77.   Because many university employees often work on several different projects or

6   even separate government grants during an academic year, accurately allocating and reporting

7   effort on each grant is very important. Thus, among the various cost principles, allocation is the

8   most relevant in the context of effort reporting.

9   78.   Employees must be able to approximate with reasonable certainty the actual time

10   they spent working on a single grant and be sure not to co-mingle their effort among different

11   projects or grants.

12   79.   OMB Circular A-21 establishes a number of effort reporting procedures that

13   require effort reports to be verified to ensure that grant employees actually performed the work for

14   which they are receiving payment. (OMB Circular A-21(J)(10)(b); GAN Enclosure 1, p. 4

15   ("Payment of any type to personnel must be supported by complete and accurate records of

16   employee time and effort.")).

17   80.   Importantly, grantees are required to reconcile estimated and actual effort expended

18   so that any excess grant funds that were budgeted or paid to the grantee will be returned to the

19   grant's issuing agency.

20   *ii.   USF Failed To Properly Use The After The Fact Activity Method For Tracking
     Time*

21   81.   With respect to a method that a grantee could use to properly track time and effort,

22   federal regulations offer guidance on acceptable methods. (OMB Circular A-21(J)(10)(c)). One

23   of the suggested methods of effort reporting is the "After the Fact Activity Records", which was

24   the method USF used to track the work performed by employees receiving TTT grant funds.

25   (OMB Circular A-21(J)(10)(c)(2)).

26   82.   Under this method, salaries paid by the grantee to employees must be supported by

27   activity reports that: (a) "reflect the distribution of activity expended by employees covered by the

1   system" (OMB Circular A-21(J)(10)(c)(2)(a)); (b) "reflect an after the fact reporting of the

2   percentage distribution of activity of employees (OMB Circular A-21(J)(10)(c)(2)(b)); and, (c)

3   "reflect the activities for which employees are compensated by the institution" (OMB Circular A-

4   21(J)(10)(c)(2)(c)).

5       83.    Furthermore, "[t]o confirm that the distribution of activity represents a reasonable

6   estimate of the work performed by the employee during the period, the reports [must] be signed by

7   the employee, principal investigator, or responsible official(s) using suitable means of verification

8   that the work was performed."  (OMB Circular A-21(J)(10)(c)(2)(c)).

9       84.    For professors and professional staff, the effort reports must be prepared each

10   academic term, but no less frequently than every six months.  (OMB Circular A-

11   21(J)(10)(c)(2)(e)).  For other employees being paid by the grant, unless alternate arrangements

12   have been agreed to, effort reports must be prepared no less frequently than monthly and must

13   coincide with one or more pay periods.  (OMB Circular A-21(J)(10)(c)(2)(e)).

14       85.    USF used the "After the Fact Activity Records" method for time and effort

15   reporting.  However, as described below, USF failed to comply with this method.  (OMB Circular

16   A-21(J)(10)(c)(2)).  Indeed, USF (1) frequently failed to document effort reports with any regard

17   for actual effort performed, (2) failed to reconcile accurate time and effort reports before drawing-

18   down grant funds for these costs, and (3) sometimes completely failed to track and account for

19   grant employees' time at all.

20              **a.**    **USF Failed To Document Time And Effort Properly**

21       86.    In some instances, USF lacked documentation on employees time and effort.  Yet,

22   with no record, or direct or indirect knowledge, of how employees had apportioned their time,

23   USF still drew down for salaries.

24       87.    For instance, the last timesheet that was recorded for Relator was given to him to

25   fill-out in summer of 2015 and it covered the months of June, July, and August of 2015.  Since

26   then, Relator has never received another timesheet from USF; however, USF continued to pay

27   Relator's salary through the TTT grant at the same percentages of time reported in the grant

28   budgets despite not having any supporting documentation.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT (False Claims Act)        19

1     88.    In or about July 2016, Relator asked the USF Office of Contracts and Grants why

2 he had not received the required time and effort forms.  The grants office informed him that they

3 had been short staffed and did not have the time to send them out.

4                     **b.    USF Failed To Reconcile Time And Effort**

5     89.    Although Dillon was the PI for the TTT grant during a portion of the relevant time

6 here, his responsibilities were also shared with his other duties as Administrative Coordinator and

7 Field Placement Director for the Teacher Education Department and as the Director of "Project

8 Learn Belize."  In fact, his "Project Learn Belize" duties caused him to be out of the country for

9 extended periods of time while still receiving compensation for the same percentage of effort on

10 the TTT grant.  On information and belief, the percentage of time and effort that USF reported to

11 the ED that Dillon spent on the TTT grant was not accurate with his actual effort on the TTT

12 grant.  Yet, USF failed to reconcile this difference and instead used TTT grant funds to pay Dillon

13 a salary that was not equitably distributed or proportional to his time.

14     90.    Further, during a relevant portion of time here, Dr. Rick Ayers ("Ayers") was paid

15 portions of his salary through the TTT grant.  However, on information and belief, the percentage

16 of time and effort USF certified to the ED that Ayers spent on the TTT grant versus his actual time

17 spent on the grant was not accurate.  On information and belief, between Ayer's time spent

18 teaching courses at USF and time spent as the Director of the Urban Education and Social Justice

19 program at USF's School of Education, Ayers failed to spend the time allocated for his work in

20 the TTT budget for which he was being compensated with TTT grant funds.

21     91.    Thus, USF drew-down from the TTT grant for salaries for time and effort not

22 actually expended by Ayers and Dillon.  In doing so, USF falsified the "effort" that its employees

23 spent on the grant.  Since the Government used TTT grant funds to reimburse USF for the original

24 percentage of Ayers and Dillon's time instead of the actual percentage of time they spent on grant

25 activities, USF improperly obtained an overpayment from the Government.

26 ///

27 ///

28 ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

### c.  USF Reduced The Time Spent By Employees On The TTT Grant But Used Grant Funds To Pay Them The Same Or More Salary

92.     USF engaged in a practice whereby it reduced the amount of time a grant employee was to spend on grant activities, but did not alter the grant employee's salary to reflect this reduction in time and effort.

93.     For instance, in or about July 2016, Dr. Kevin Kumashiro ("Kumashiro"), the Dean of the USF School of Education, decided to significantly decrease the amount of Relator's time that he was to devote to work that would be charged to the grant.  Yet, USF continued to pay Relator the same salary using TTT grant funds.  This happened again in or about August 2016 when Kumashiro reduced Relator's percentage of time even more.  As before, USF still paid Relator the same salary at his original percentage of time.  Relator complained of the reduction in time and effort, but no adjustment was made by USF.

94.     Relator was not the only grant employee whose salary remained the same despite a reduction in time and effort spent on grant activities.  In or about September 2015, Dillon was serving as the PI and the co-coordinator of the SFTR program.  However, Kumashiro reduced the percentage of time and effort that Dillon was to spend on the TTT grant by removing him from the role as the SFTR co-coordinator.  Despite this, Dillon received a salary increase using TTT grant funds.  In or about May 2016, Kumashiro again reduced Dillon's percentage of time and effort on the TTT grant and yet paid him the same salary.

### d.  Relator Informed USF Of Effort Reporting Issues

95.     In or about July 2016, Relator informed USF regarding some of the problems with its time and effort reporting as it related to the TTT grant.

96.     Yet, USF failed to adhere to the effort reporting requirements.  USF knew that this information was not being properly tracked and recorded in direct violation of applicable laws and regulations.  USF's conduct in failing to properly reconcile estimated and actual effort allowed USF to avoid and conceal its obligation to refund grant money to the issuing agency and amounts to reverse false claims.

///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

97.     Further, by failing to comply with the effort reporting requirements, USF's grant application and its certification of compliance amount to false claims.

98.     Because USF failed to properly document, record, and implement an effective effort reporting and reconciliation system, USF was able to submit and receive payment for efforts that were not in compliance with federal regulations, leading to the presentation of false claims.

**G.     USF Submitted False Progress Reports to Receive Continued Federal Funding**

99.     Grantees are required to submit periodic updates and progress reports related to the federally funded project. (34 CFR § 75.118).

100.     However, in an effort to secure continued federal funding, USF submitted to the ED inaccurate progress reports.

101.     For example, in the Annual Performance Report covering the period of October 1, 2013 to September 30, 2014, USF informed the ED that there had been a change to key personnel. Specifically, USF stated that "Rick Ayers and Jeff Dillon . . . will become the Co-Directors of the TTT grant in January, 2015." However, on or about September 9, 2015, Kumashiro sent out an email stating that "I will discontinue the co-coordinator model because I believe that the program will be better served if one faculty member is more deeply immersed in each aspect of the program. Therefore, I am asking Rick [Ayers] to serve as SFTR coordinator, and Jeff [Dillon] to serve as PI of the TTT grant, and both will represent USF on the advisory board. This change is effective immediately . . ." Despite this change, in its Annual Performance Report covering the period of October 1, 2014 to September 30, 2015, USF checked the "No" box in response to the question of whether there were any changes to key personnel.

102.     By way of another example, on or about November 19, 2015, USF submitted an Annual Performance Report to the ED with incorrect and misleading data, statistics, and information about the SFTR program's progress. Specifically, to make it appear that SFTR was meeting the goals USF had set forth in the TTT grant application, USF provided the ED with false calculations about the number of student-teachers in the SFTR program. This was done to secure

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT (False Claims Act)                                                              22

1  renewed funding and to appear that SFTR was meeting its application goal of 150 student-
2  teachers.

3       **VI.   RELATOR REPORTS VIOLATIONS AND IS RETALIATED AGAINST**

4       103.    Beginning in or about July 2015, Relator noticed discrepancies with his actual
5  compensation and what was reported on the TTT grant budget presented to the ED. Relator began
6  looking into the TTT grant budget for years three, four and five. As Relator dug further into the
7  TTT budget and other TTT grant documentation, he began to realize more improprieties with how
8  TTT grant money was being used.

9       104.    On or about April 6, 2016, Relator provided Osler with a draft letter that Relator
10  planned to send to Donna Davis ("Davis"), USF's General Counsel, concerning, in part, what
11  Relator perceived to be violations of the Federal False Claims Act as it related to the TTT grant.
12  Osler urged Relator not to submit the letter and told him to consider the repercussions to Relator's
13  career if he sent it. Fearing retaliation and in order to appease Osler, Relator redrafted the letter to
14  omit the False Claims Act violations and, on or about April 8, 2016, sent the letter to Kumashiro
15  instead of Davis.

16      105.    On or about April 28, 2016, Relator met with Osler and Kumashiro to discuss the
17  concerns set forth in his April 8 letter. During this meeting, Relator raised concerns about USF
18  being noncompliant with grant regulations pertaining to the TTT grant and that such
19  noncompliance was possibly a violation of the False Claims Act.

20      106.    On or about May 16, 2016, Osler told Relator that he had concerns with Relator
21  raising False Claims Act violations and any audit that may result. Also during this conversation,
22  Relator informed Osler that Osler needed to monitor the use of TTT grant funds better.

23      107.    On or about June 24, 2016, Relator called and emailed Davis seeking to inform her,
24  *inter alia*, of the TTT grant issues. Relator was told he could put forth his concerns in writing.

25      108.    On or about June 28, 2016, Relator emailed USF's President, Dr. Paul Fitzgerald
26  ("Fitzgerald"), asking to schedule a meeting to discuss, *inter alia*, the TTT grant issues. Fitzgerald
27  refused to meet with Relator.

28  ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1       109.    On or about July 20, 2016, Relator spoke again to Osler about TTT grant

2 compliance issues and unallowable charges. Osler said that USF could charge anything related to

3 the SFTR program to the TTT grant, which was not correct. Osler did not address Relator's

4 concerns.

5       110.    Later that same day, Relator wrote a complaint to Davis in which he raised again

6 his concerns with the TTT grant and possible False Claims Act violations.

7       111.    On or about July 27, 2016, USF's Human Resources Employee Relations Manager,

8 Neumiia Duncan-Reed ("Duncan-Reed") responded to Relator's July 20 letter, explaining she

9 would be coordinating USF's response.

10       112.    On or about August 5, 2016, Duncan-Reed followed up by asking Relator to send

11 "copies of the documentation outlining the charges in question" and "copies of pertinent

12 regulations." Duncan-Reed also stated that "[u]pon receipt of the requested documents, a request

13 will be made to the Internal Auditor of the University to review the complaint. If the complaint

14 has merit, the University will make the needed corrections and advise the appropriate authorities."

15       113.    On or about August 13, 2016, as requested, Relator sent Davis the charges and the

16 pertinent regulations. On information and belief, USF has done nothing to date to address, fix, or

17 correct any of Relator's concerns regarding the TTT grant.

18       114.    Instead, in retaliation for his complaints, Relator was terminated from USF as the

19 SFTR Assistant Director on or about September 30, 2016.

20                **VII.    THE AMERICORPS GRANTS**

21       115.    Relator and Plaintiff reallege and incorporate by reference paragraphs 1 through

22 114 as though fully set forth herein.

23       116.    USF first received federal funds through AmeriCorps in the 2010-11 SFTR

24 program year. USF also received AmeriCorps grants for the 2011-12, 2012-13 and 2013-14

25 program years. However, for the 2014-15 and 2015-16 program years, USF transitioned

26 management of the AmeriCorps grants to Defendant Community Initiatives ("CI"). The

27 AmeriCorps grants were moved back to USF for the 2016-17 and 2017-18 program years.

28 ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1   117.    As recipients of these federal funds, Defendants USF and CI were, and are,

2   required to comply with the same cost principles and federal regulations applicable to the ED's

3   TTT grant described above (OMB Circulars A-110, A-21; 45 CFR § 2543) as well as AmeriCorps

4   specific regulations (45 CFR §§ 2520-2530). As described below, Defendants have caused false

5   claims to be submitted to the United States by failing to comply with federal regulations pertaining

6   to AmeriCorps funding.

7   118.    AmeriCorps is a federal initiative of the Corporation for National and Community

8   Service ("CNCS"). AmeriCorps was created through the National Community Service Trust Act

9   to foster and facilitate nationwide community service opportunities. AmeriCorps funds many

10  programs around the United States, including the SFTR program.

11  119.    CaliforniaVolunteers is a state agency that administers AmeriCorps grants in

12  California, including the AmeriCorps grants at issue here.

13  120.    Students who enroll into the SFTR program become members of AmeriCorps and

14  must meet certain service-hour requirements to receive (1) federal stipends, and (2) an

15  AmeriCorps Education Award ("Education Award"), which is given to qualifying students at the

16  end of a service-year for their participation in the SFTR program.

17  121.    Generally, full-time AmeriCorps members must complete 1700 hours of service to

18  receive the Education Award and 900 hours if they are part-time members. (45 CFR § 2527.10(a)-

19  (b)). The Education Award can be used to repay student loans or to pay a student's current

20  educational expenses. (45 CFR § 2528.10). The Education Award can also be paid directly to the

21  student's university to cover the abovementioned costs. (45 CFR § 2528.30).

22  122.    In order for members to receive the Education Award at the end of their service

23  year, the grantee must certify that the member met the eligibility requirements for the award,

24  including the required service hours. (45 CFR §§ 2526.10, 2526.15). This certification is made

25  during a closeout process at the end of the year where a grantee attests that it has "[v]erified that

26  all members enrolled" in the program "have exited with the appropriate educational award status."

27  (AmeriCorps Program Closeout Procedure Form).

28  ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1   123.   Any organization or individual that makes false certifications to AmeriCorps to

2   secure an AmeriCorps stipend and/or an Education Award payment may be liable for the recovery

3   of funds and subject to civil and criminal sanctions.  (45 CFR § 2526.10(e)).

4   **A.     False Hours And Certifications For Education Awards**

5   124.   As described above, full-time AmeriCorps members must complete 1700 hours of

6   service to receive the Education Award and 900 hours if they are part-time members.  (45 CFR

7   §2527.10(a)-(b)).

8   125.   As recipients of AmeriCorps funds, Defendants were "required to ensure that time

9   and attendance recordkeeping is conducted by the AmeriCorps member's supervisor." (2015

10  Terms and Conditions for AmeriCorps State and National Grants).  However, as described below,

11  there was little-to-no effort by Defendants to obtain and ensure that the service hours being

12  reported by students were actually accurate and sufficiently detailed.

13  *i.     Timesheets Were Not Being Accurately Or Contemporaneously Filled Out*

14  126.   Relator has been informed that many students would go weeks or months without

15  filling out any timesheets.  Students would then go back and populate and submit timesheets well

16  after the work was supposedly done.  By failing to secure timesheets in a timely fashion,

17  Defendants had no way of knowing if the students had in fact completed the tasks and hours that

18  Defendants ultimately certified were completed.

19  127.   Further, Relator has been informed that students frequently did not fill out time

20  records based on the actual service hours students worked.  For instance, many students would

21  simply use past timesheets and copy the hours from those.  Therefore, the timesheets were often

22  mere duplicates of prior reports, sometimes with minor shifts in timing to emulate authenticity.

23  Other students would fill out timesheets in advance of the month and turn them in before ever

24  working those hours.  Some students would secure pre-printed timesheets from another student

25  and copy hours from those records.

26  128.   Many students also failed to discount hours for their lunch breaks despite the

27  timesheet certifications instructing them to discount that time.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

28  ///

1    129.   At times, Osler realized that students had fallen months behind on their timesheets

2    and would tell them just to make sure their hours added up to the necessary amounts needed to

3    meet the 1700 service-hours requirement.  Indeed, when communicating with students about the

4    timesheets, the tone and instruction from Defendants demonstrated a clear emphasis not on

5    whether students actually performed the hours but rather that they ensure they <u>document</u> hours.

6    For instance, in a handout entitled "Documenting AmeriCorps Hours for Part-Time Members",

7    students were instructed that "[y]ou are expected to <u>document</u> 900 hours, and it is very important

8    that you <u>document</u> this many hours . . . You are going to <u>document</u> that you've served ~ 720 direct

9    hours and no more than 180 indirect hours . . . We need you to document ~ 25 hours each week

10   (roughly 20 direct and 5 indirect hours)" (emphasis in original).

11   130.   On information and belief, SFTR staff members went so far as to fill out timesheets

12   for students who had fallen behind on their time records.  For example, in or about the spring of

13   2015, a student had fallen over two months behind on her timesheets.  Osler filled out the missing

14   timesheets for the student, printed them out and had her sign them.

15   ***ii.     Timesheets Were Often Not Signed Appropriately***

16   131.   "Time and attendance records must be signed and dated both by the member and

17   his/her supervisor."  (2015 Terms and Conditions for AmeriCorps State and National Grants).

18   Because of this requirement, timesheets for SFTR students had signature lines for the student and

19   for the "Cooperating Teacher" ("CT") who served as the supervising teacher at the school site

20   where the SFTR student performed his/her service hours.

21   132.   However, timesheets were submitted that were not always signed by the student

22   and/or the CT, such that the time records were not being properly verified.  Relator was informed

23   that many students' practice was to never show their timesheets to their CT, but instead turn them

24   into SFTR with the CT signature line left blank.

25   133.   Indeed, on many occasions, Osler signed the CT signature line of students'

26   timesheets despite the fact that Osler was <u>not</u> the students' CT and was <u>not</u> on-site to verify the

27   students had in fact performed the documented hours.

28   ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1

### iii.   *Defendants Did Not Properly Supervise Students' Indirect Hours*

2    134.    Defendants failed to adequately supervise students' performance of the "indirect

3   hours" that counted toward their service-hours total. An AmeriCorps grant recipient "must

4   provide members with adequate supervision by qualified supervisors consistent with the approved

5   award application." (2015 Terms and Conditions for AmeriCorps State and National Grants).

6   This supervision requirement applies to both "direct" and "indirect" service hours. Direct and

7   indirect hours both count towards a student's total amount of service hours for the year. Direct

8   hours include the time students spend at their school sites. Indirect hours include time spent

9   working outside the placement site, such as lesson planning and grading.

10    135.    Because SFTR students performed many of their indirect hours away from their

11   placement site, these hours lacked adequate supervision. In or about December 2015, as a way to

12   finally address this issue, Osler attempted to put in place a policy that ensured at least some level

13   of oversight by supervisors of the indirect hours that students were documenting and counting

14   toward their service hours.

15    136.    This policy stated, in relevant part, that:

16       On Monday of each week, SFTR members meet with their
         supervisors to plan a schedule for the upcoming week, and identify
17       indirect activities and hours that will likely be conducted. The
         members and their supervisors will fill out and sign the
18       Indirect Hours Preapproval Timesheet at this time.

19       On Friday of each week, or on Monday of the following week,
         SFTR members will meet again with their supervisors to review the
20       activities and indirect hours served from that week. The members
         and their supervisors will then sign off on both the Indirect Hours
21       Post-Approval Timesheet and the Weekly Timesheet.

22    137.    Although this policy was in place, the process soon became too much work for

23   CTs, so Osler eventually directed students to just fill out the pre-approval and post-approval forms

24   themselves and turn those into SFTR without the CTs approving and signing them. Often students

25   filled out and signed both the pre-approval and post-approval forms at the same time. Thus,

26   students were left completely on their own and unsupervised for these indirect hours.

27   ///

28   ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

*iv.* ***Defendants Did Not Provide The Required Training They Promised To Provide***

138.    AmeriCorps grant recipients "shall provide information or training to their AmeriCorps members about how their program is part of the national AmeriCorps program and about the other national service programs of CNCS." (2015 Terms and Conditions for AmeriCorps State and National Grants).

139.    In their applications for AmeriCorps funds, Defendants represented that it would provide training for AmeriCorps members. For instance, in the 2013-14 application, Defendant USF stated that:

> As part of the initial training for participating in the San Francisco Teacher Residency members are introduced to the history of National Service in the United States from its beginnings under President Roosevelt during the Great Depression to the development of the Peace Corps and Volunteers of America under Presidents Kennedy and Johnson to the development of the Corporation for National and Community Service and AmeriCorps. Other parts of the core AmeriCorps training that all members receive include: Understanding prohibited activities; members' rights and responsibilities; codes of conduct as an AmeriCorps member; mandated child abuse reporting; and working with diverse communities. Supervisors and the program associate will monitor member activities to ensure that no one is engaged in prohibited activities.

140.    On information and belief, despite the attestations in their applications regarding training, Defendants did not conduct any orientations or special presentations about the history of AmeriCorps or other national service programs of CNCS.

**B.      Defendants Have Allowed Members From Other Programs To Receive AmeriCorps Funds**

141.    Defendants have engaged in a practice whereby USF students were paid AmeriCorps funds who were not entitled to receive those payments because those students were not part of the SFTR program and therefore did not meet the membership criteria for receipt of these federal monies.

142.    For example, during the 2014-15 service year, the SFTR program was under-enrolled by two full-time students. However, SFTR had already received the AmeriCorps funding for the year that included funds for the two unfilled student slots. SFTR requested that

1  AmeriCorps allow those two full-time slots to be converted into four part-time slots for the

2  program. AmeriCorps agreed.

3      143.   However, the four students who were placed into the part-time slots (and received

4  AmeriCorps funds) never went through the admissions process that CI promised to follow in its

5  grant application. CI's 2014-15 application for the AmeriCorps grant stated that "[c]andidates for

6  SFTR are admitted through a rigorous screening process . . . After an initial paper screening that is

7  conducted by a committee of representatives from each of the SFTR partners, follow up interviews

8  of candidates focus on communication, interpersonal skills, leadership abilities, and commitment

9  to teaching in SFUSD's high-need schools."

10     144.   Not only did these part-time students not go through the screening process, but they

11  were never even admitted into the SFTR program. Instead, these students were part of other USF

12  programs and did not participate in many of the requirements of the SFTR program such as

13  attending the practicum seminars, small group meetings and meetings with supervisors. These

14  part-time students also started much later into the service year than the full-time SFTR students.

15

16     145.   Additionally, these part-time students did not meet other promises that were made

17  in Defendants' applications to receive AmeriCorps funds. For instance, CI's application for the

18  2014-15 program year stated that "residents commit to teaching in San Francisco's hard-to-staff

19  schools and subjects for a minimum of three years." This was not a commitment that the part-time

20  students made.

21     146.   Instead of admitting students into the SFTR program pursuant to the processes

22  promised in the application described above, Osler attempted to fill the part-time slots by emailing

23  USF students not in the SFTR program. Osler's email stated, in relevant part:

24          I'm writing to share a great opportunity for USF students doing their
            student teaching in San Francisco that I hope you'll be interested in.
25          SFTR is an AmeriCorps program, and we have some extra resources
            through our AmeriCorps grant that we can't use directly – therefore,
26          we are looking for USF students who might be interested in
            becoming part-time AmeriCorps members under the SFTR
27          umbrella. Here is what it would entail:

28              •   You will receive a stipend of $5,000 spread out over the

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1    2015-16 school year (2 paychecks/month)

2    • At the end of the year, you will also receive a $2,865
3    Education Award that can be put towards educational
     expenses (eg. paying off loans) . . .

4    • In addition, should you be interested in a formal
     teaching position in SFUSD, we can help you with your
5    application materials, connect you with principals, and
     support you in obtaining an early teaching . . .

6    In return, what you would need to do is fill out timesheets and email
7    them to me once per month. (If you're interested, I'll provide more
     details about the timesheets). We will also invite you to a few
8    community service events in the USF area. If you're interested (even
     slightly!) or if you have any questions, please email me back as soon
9    as possible. Ideally we can sort this out by the end of this week and
     you could start tracking your time as soon as Monday, 10/19.

10   Through this correspondence, Osler was able to recruit and fill the part-time slots with

11   non-SFTR students.

12   147.   Similarly, in the 2015-16 program year, full-time slots were again converted into

13   part-time slots and filled with students who were not members of the SFTR program. These

14   students, like those described above, should not have been receiving federal funds through the

15   AmeriCorps grant.

16   **C.   Lack of Effort Reporting And Reconciliation For Employees Paid With AmeriCorps
17   Funds**

18   148.   On information and belief, Defendants have also failed to keep adequate time and

19   effort documentation for employees paid through the AmeriCorps grants. For example, since at

20   least 2014, employees whose compensation is paid for using AmeriCorps funds have frequently

21   failed to submit timesheets reporting their activity on these grants.

22   149.   By way of another example, believing that Osler was filling-out timesheets for

23   Relator and submitting them on Relator's behalf and without Relator's knowledge or approval,

24   Relator broached this matter with Osler on or about August 22, 2016. Relator asked Osler (1)

25   whether Relator needed to be submitting timesheets to CI, and (2) whether Osler had been

26   submitting timesheets to CI on behalf of Relator. To both questions, Osler said "no."

27   ///

28   ///

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

1   150.   However, Osler had filled-out and submitted dozens of timesheets for Relator

2   without Relator's certification, permission, or knowledge.  Many of these timesheets were an

3   entirely inaccurate documentation of how Relator had spent his time.

4   151.   On or about August 27, 2016, Relator spoke by phone with Osler.  During this

5   conversation, Relator again asked why Osler lied about the timesheets and asked Osler to identify

6   the other funding sources of Relator's salary and benefits.  Osler told Relator that should not be a

7   concern of Relator's.

8   152.   Additionally, on information and belief, Defendants were paying part of Relator's

9   salary in 2014 through AmeriCorps funds when Relator was not an employee of this AmeriCorps

10  grant and did not work on the grant.  Defendants failed to reconcile those payments with the fact

11  that Relator did no work whatsoever on the AmeriCorps grant.

12  **D.   USF Received AmeriCorps Funding For An Eliminated Position**

13  153.   Recruiting AmeriCorps members is a requirement for all grantees.  (45 CFR

14  §2520.35).  Therefore, in its application for continued funding for the 2016-17 and 2017-18

15  service years for the SFTR program, USF told AmeriCorps that it would recruit members for the

16  program.  Specifically, USF stated that "[t]he Assistant Director of Recruitment, employed at

17  USF, recruits for SFTR."

18  154.   USF received approximately $27,105 in funding from AmeriCorps for the Assistant

19  Director of Recruitment position.  However, on or about September 30, 2016, USF eliminated the

20  position.  Despite knowing and intending that no person would be fulfilling the recruiter role, USF

21  has received funding for this position and has not returned it to the Government.

22  **VIII.   FINANCIAL HARM TO THE UNITED STATES**

23  155.   As a direct and proximate result of Defendants' knowing and intentional acts of

24  fraud and misrepresentation as alleged herein, the United States has lost a significant amount of

25  money.

**COUNT I**
(Federal False Claims Act - 31 U.S.C. § 3729(a)(1)(A))

26

27  156.   Relator and Plaintiff reallege and incorporate by reference paragraphs 1 through

28  155 as though fully set forth herein.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT (False Claims Act)                                                                   32

1    157.    This is a civil action brought by Relator on behalf of the United States against

2  Defendants under the Federal False Claims Act, 31 U.S.C. §§ 3729-33.

3    158.    Defendants knowingly or in reckless disregard or in deliberate ignorance of the

4  truth or the falsity of the information involved, presented or caused to be presented, false or

5  fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(l)(A).

6    159.    The Government Payors, unaware of the falsity of the claims and/or statements

7  made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or

8  statements, paid federal funds to Defendants.  Had the United States known of the falsity of the

9  claims and/or statements made, payment or approval would have not have been made for such

10  claims.

11    160.    The United States suffered actual damages as a direct and proximate result of

12  Defendants' fraud and misrepresentations as alleged herein.

13

**COUNT II**
(Federal False Claims Act - 31 U.S.C. § 3729(a)(1)(B))

14

15    161.    Relator and Plaintiff reallege and incorporate by reference paragraphs 1 through

160 as though fully set forth herein.

16

17    162.    Defendants, in reckless disregard or deliberate ignorance of the truth or the falsity

of the information involved, made, used, caused to be made, or caused to be used, false or

18

fraudulent records and statements to get false or fraudulent claims paid or approved in violation of

19

31 U.S.C. § 3729(a)(1)(B).

20

21    163.    The Government Payors, unaware of the falsity of the claims and/or statements

made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or

22

statements, paid federal funds to Defendants.  Had the United States known of the falsity of the

23

claims and/or statements made, payment or approval would have not have been made for such

24

claims.

25

26    164.    The United States suffered actual damages as a direct and proximate result of

Defendants' conduct as alleged herein.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292    27    ///

28

**COUNT III**
(Federal False Claims Act - 31 U.S.C. § 3729(a)(1)(G))

165.    Relator and Plaintiff reallege and incorporate by reference paragraphs 1 through 164 as though fully set forth herein.

166.    Defendants have violated 31 U.S.C. § 3729(a)(l)(G) by knowingly making, using or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

167.    The United States suffered actual damages as a direct and proximate result of Defendants' conduct as alleged herein.

**COUNT IV**
(Federal False Claims Act - 31 U.S.C. § 3730(h))

168.    Relator and Plaintiff reallege and incorporate by reference paragraphs 1 through 167 as though fully set forth herein.

169.    31 U.S.C. § 3730(h) provides, in relevant part, "(1) Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of . . . efforts to stop 1 or more violations of this subchapter."

170.    As described above, Relator raised issues related to the mismanagement of TTT grant funds to his supervisor and other administrators at USF.

171.    Relator was then terminated from employment by USF on account of his lawful and protected conduct.

172.    As a direct and proximate result of USF's conduct, Relator has suffered damages.

**PRAYER FOR RELIEF**

WHEREFORE, Relator and Plaintiff pray for the following relief:

1.    Judgment for the United States against Defendants in an amount equal to three times the damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

2.    An award to the Relator of the maximum allowed under 31 U.S.C. § 3730(d);

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

3.   All damages Relator is entitled to under 31 U.S.C. § 3730(h), including but not limited to double back pay, reinstatement, front pay, and other special and general damages;

4.   Attorneys' fees, expenses and costs of suit herein incurred by or on behalf of the Relator; and

5.   Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator and Plaintiff hereby demand that this matter be tried before a jury.

Dated: November 23, 2016

Respectfully submitted,

By _____
Scott M. Stillman

McGuinn, Hillsman & Palefsky
Scott M. Stillman, Cal. State Bar No. 276506
535 Pacific Avenue
San Francisco, California 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202
Emails:  sstillman@mhpsf.com

*Attorneys for Plaintiff-Relator*

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT (False Claims Act)

35